## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PLIANT CORPORATION, et al.,[1] | Case No. 09-10443 (MFW) |
| Debtors. | Joint Administration Requested |

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) AND 364(e) AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED PARTIES, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (III) GRANTING RELATED RELIEF

This matter is before the Court on the motion dated February 11, 2009 (the "Motion")[2] of Pliant Corporation ("Pliant") and its affiliated debtors, as debtors-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of an interim order (the "Interim Order") and a final order (this "Final Order"), under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

---

[1] The Debtors are: Pliant Corporation (Tax ID No. XX-XXX7725), Pliant Corporation International (Tax ID No. XX-XXX3075), Uniplast Holdings, Inc. (Tax ID No. XX-XXX9589), Pliant Film Products of Mexico, Inc. (Tax ID No. XX-XXX0805), Pliant Packaging of Canada, LLC (Tax ID No. XX-XXX0929), Alliant Company LLC (Tax ID. No. XX-XXX6811), Uniplast U.S., Inc. (Tax ID. No. XX-XXX9066), Uniplast Industries Co. (N/A) and Pliant Corporation of Canada Ltd. ("Pliant Toronto") (N/A). The mailing address for Pliant Corporation is 1475 Woodfield Road, Suite 700, Schaumburg, IL 60173.

[2] All defined terms shall have the meaning ascribed to them in the Motion or DIP Facility Documents (as defined below) unless otherwise defined herein.

(1) authorization for Pliant (the "Borrower") to obtain secured postpetition financing consisting of a multiple draw secured term loan facility in an aggregate principal amount not to exceed $75 million (the "DIP Facility"), with an initial draw of $25 million on the Closing Date (as defined in the DIP Agreement (as defined herein)), and for each other Debtor (collectively, the "Guarantors") to jointly and severally guarantee the payment and performance of the Borrower's obligations under the DIP Facility,[3] from (i) certain funds and/or accounts managed and/or advised by DDJ Capital Management, LLC, (ii) WCP, L.P. and/or its affiliates, (iii) WCIP, L.P. and/or its affiliates, (iv) WCOP, Ltd. and/or its affiliates and (v) Wayzata Opportunities Fund II, L.P. and/or its affiliates, as lender(s), together with the other lender(s) from time to time party thereto (the "DIP Lenders") with The Bank of New York Mellon, as Administrative Agent (in such capacity, the "DIP Agent"), pursuant to the terms of this Final Order and that certain Secured Super-Priority, Debtor-in-Possession Multiple Draw Term Loan Agreement, by and among the Borrower, Guarantors, DIP Agent and DIP Lenders, in the form filed with this Court on March 5, 2009 (as the same may be further amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Agreement," and together with any related documents and instruments (including any amendments) delivered pursuant to or in connection therewith (and including the "Loan Documents" referenced therein), the "DIP Facility Documents");

(2) authorization for the Debtors to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

---

[3]    In the case of Pliant Toronto, such Debtor's guarantee of the other Debtors' obligations under the DIP Facility is limited.

2

(3) authorization for the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), as more fully set forth in this Final Order;

(4) authorization for the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), on the terms and conditions set forth in this Final Order;

(5) authorization to provide adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Working Capital Liens") granted for the benefit of the lenders (such lenders in such capacities, the "Prepetition Working Capital Lenders") under that certain Working Capital Credit Agreement, dated as of July 18, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Credit Agreement"), among the Borrower, certain of its subsidiaries named therein (the "Subsidiary Borrowers"), the Prepetition Working Capital Lenders and Merrill Lynch Bank USA, as Administrative Agent (in such capacity and in the capacity of Collateral Agent under the security documents for the Prepetition Working Capital Obligations (as defined herein) on behalf of the Prepetition Working Capital Lenders, the "Prepetition Working Capital Agent") and as a Prepetition Working Capital Lender, securing the Debtors' obligations (the "Prepetition Working Capital Obligations") under the Prepetition Working Capital Credit Agreement and all collateral and ancillary documents

3

executed or delivered in connection therewith (the "Prepetition Working Capital Facility Documents"), as more fully set forth in this Final Order;

(6) authorization to provide adequate protection of the liens and security interests (such liens and security interests, the "First Lien Notes Liens") granted for the benefit of the holders (the "First Lien Noteholders") of Pliant's 11.85% Senior Secured Notes due 2009 and the 11.35% Senior Secured Discount Notes due 2009 (collectively, the "First Lien Notes") issued pursuant to that certain Amended and Restated Indenture, dated as of February 17, 2004 (as amended and restated as of May 6, 2005 and supplemented pursuant to that certain First Supplemental Indenture dated as of July 18, 2006) (as in effect on the date hereof, the "First Lien Indenture") among Pliant and Wilmington Trust Company as indenture trustee (in such capacity, the "First Lien Indenture Trustee" and, as collateral agent (in such capacity, the "First Lien Collateral Agent") under the security documents securing the Debtors' obligations (the "First Lien Notes Obligations") under the First Lien Indenture and all collateral and ancillary documents executed or delivered in connection therewith (collectively, the "First Lien Notes Documents")), as more fully set forth in this Final Order;

(7) authorization to provide adequate protection of the liens and security interests (such liens and security interests, the "Second Lien Notes Liens") granted for the benefit of the holders (the "Second Lien Noteholders") of Pliant's 11-1/8% Senior Secured Notes due 2009 issued pursuant to that certain Indenture dated as of May 30, 2003 (as in effect on the date hereof, the "Second Lien Indenture"), among Pliant and Wells Fargo Bank, N.A., successor indenture trustee (in such capacity, the "Second Lien Indenture Trustee" and, as collateral agent (in such capacity, the "Second Lien Collateral

4

Agent") under the security documents securing the Debtors' obligations (the "Second Lien Notes Obligations") under the Second Lien Indenture and all collateral and ancillary documents executed or delivered in connection therewith (collectively, the "Second Lien Notes Documents")), as more fully set forth in this Final Order; and

(8) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the (a) Debtors, (b) DIP Agent and DIP Lenders, (c) Prepetition Working Capital Lenders, Prepetition Working Capital Agent, First Lien Noteholders, First Lien Indenture Trustee and First Lien Collateral Agent (collectively, the "Prepetition Secured Entities," and together with the DIP Agent and the DIP Lenders, the "Secured Lending Entities"), and (d) Second Lien Noteholders, Second Lien Indenture Trustee and Second Lien Collateral Agent (collectively, the "Second Lien Notes Parties") to implement the terms of this Final Order.

This Court having held an emergency interim hearing (the "Interim Hearing") on the Motion to consider entry of the Interim Order on February 12, 2009; and after considering all the pleadings filed with this Court, including the objection of the Ad Hoc Committee of Certain Holders of 11 1/8% Senior Secured Notes due 2009 (the "Ad Hoc Group of Second Lien Noteholders") to the entry of the Interim Order and the relief provided therein (the "Second Lien Objection"); and, after considering the evidence presented on the record of the Interim Hearing, this Court having overruled the Second Lien Objection, this Court entered the Interim Order on February 13, 2009, which authorized the Debtors, on an interim basis, to obtain from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $75 million, consisting of (i) an initial draw of $25 million on the Closing Date, (ii) up to three (3) additional drawings, each in a principal amount not less than $5 million and, in the aggregate for such three

(3) drawings, a principal amount not to exceed $25 million and (iii) a drawing in an aggregate amount not to exceed $25 million (the "Foreign Debt Draw") to the extent necessary to repay: (a) the aggregate outstanding amount of the obligations owed by the foreign subsidiary borrowers under that certain Fixed Asset Credit Agreement, dated as of July 18, 2006, by and among Pliant Corporation Pty. Ltd., Pliant Toronto, Pliant Film Productions GmbH and Aspen Industrial, S.A. de C.V., as borrowers, the financial institutions and entities party thereto as lenders (such lenders in such capacities, the "Prepetition Fixed Asset Lenders"), Merrill Lynch Bank USA, as administrative agent (in such capacity, the "Prepetition Fixed Asset Agent") and Merrill Lynch Commercial Finance Corp., as sole lead arranger and book manager (the "Prepetition Fixed Asset Credit Agreement") and (b) the aggregate outstanding amount of the "Foreign Revolving Loans" (as defined in the Prepetition Working Capital Credit Agreement) under the Prepetition Working Capital Facility Documents (collectively, the "Prepetition Foreign Subsidiary Obligations"), in each case, pursuant to the terms of, and on the conditions contained in, the DIP Agreement; provided, however, that with respect to any borrowing on or after the date that is the earlier of (x) forty-five (45) days after the Petition Date (as defined herein) and (y) the date that this Court enters the Final Order (such earlier date, the "Foreign Draw Trigger Date"), it shall be a condition precedent that the Debtors shall have obtained the Foreign Debt Order from this Court and the Foreign Debt Recognition Order from the Canadian Court (as defined herein), each in form and substance satisfactory to the DIP Lenders; and

This Court having found that, under the circumstances, due and sufficient notice of the Motion and this hearing (the "Final Hearing", and together with the Interim Hearing, the "Hearings") was provided by the Debtors as set forth in Paragraph P below, and having held the Final Hearing on March 20, 2009 after considering all the pleadings filed with this Court; and all

6

objections to the entry of the Final Order and the relief provided therein having been resolved; and upon the record made by the Debtors at the Hearings, including through the testimony and the Affidavits of Harold C. Bevis, Chief Executive Officer of Pliant Corporation, in Support of First Day Motions and Steven R. Strom, Managing Director with Jefferies & Co. as financial advisor to the Debtors, and after due deliberation and consideration and good and sufficient cause appearing therefore:

### THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A. On February 11, 2009 (the "Petition Date"), each Debtor filed a petition with this Court commencing a case under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B. Subsequent to the filing of the Chapter 11 Cases, Uniplast Industries Co., Pliant Packaging of Canada, LLC and Pliant Toronto (collectively, the "Canadian Debtors") filed applications in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") seeking, among other things, (i) the recognition of their Chapter 11 Cases as "foreign proceedings" as defined by section 18.6 of the Companies' Creditors Arrangement Act, R.S.C., 1985, chapter C-36, as amended, (ii) the staying of all proceedings against (a) the Canadian Debtors in Canada, (b) the Canadian Debtors' property and (c) the Canadian Debtors' respective directors and officers, and (iii) the recognition of these proceedings and the orders, judgments and decrees of this Court that were entered in accordance with the "First Day Hearing" of the Chapter 11 Cases, specifically including the Interim Order. On February 11, 2009, the Canadian Court entered a recognition order granting the relief set forth in clauses (i) and (ii) above to the

Canadian Debtors and, on February 13, 2009, the Canadian Court entered a recognition order granting the relief set forth in clause (iii) above to the Canadian Debtors.

C. On February 24, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee").

D. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

E. Without prejudice to the rights of any other non-Debtor party-in-interest (but subject to the limitations thereon described below in Paragraph 19) the Debtors hereby agree and stipulate that:

(i)    as of the Petition Date, the Debtors were truly and justly indebted to the Prepetition Working Capital Lenders pursuant to the Prepetition Working Capital Facility Documents in the aggregate principal amount of approximately $167.4 million, plus accrued and unpaid interest with respect thereto and any reasonable fees, costs and expenses provided under the Prepetition Working Capital Facility Documents (the "Prepetition Working Capital Indebtedness");

(ii)    the Prepetition Working Capital Liens securing the Prepetition Working Capital Obligations were granted by the applicable Debtors to the Prepetition Working Capital Agent, for its benefit and the benefit of the Prepetition Working Capital Lenders, including a first priority security interest in, among other things, inventory, receivables, deposit accounts, the capital stock of, or other equity interests in, existing and future domestic and first-tier foreign subsidiaries, investment property and certain

other assets (the "Prepetition Working Capital First Priority Collateral") and a second priority security interest in the Prepetition First Lien Notes First Priority Collateral (as defined herein) (the "Prepetition Working Capital Second Priority Collateral," and together with the Prepetition Working Capital First Priority Collateral, the "Prepetition Working Capital Collateral"); and

(iii)(a) the Prepetition Working Capital Obligations constitute legal, valid and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition Working Capital Obligations exist; (c) no portion of the Prepetition Working Capital Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Working Capital Facility Documents are valid and enforceable by the Prepetition Working Capital Agent and Prepetition Working Capital Lenders against each of the Debtors; (e) the Prepetition Working Capital Liens constitute valid, binding, enforceable and perfected liens in and to the Prepetition Working Capital Collateral, having the priority set forth in the Prepetition Working Capital Facility Documents and subject only to the liens described in the Prepetition Working Capital Facility Documents, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Prepetition Working Capital Obligations constitute allowed secured claims against the Debtors' estates; and (g) no claim of or cause of action held by the Debtors exists against the Prepetition Working Capital Agent, Prepetition Working Capital Lenders or their agents, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other

9

claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Working Capital Facility Documents (or the transactions contemplated thereunder), Prepetition Working Capital Obligations or Prepetition Working Capital Liens, including without limitation, any right to assert any disgorgement or recovery.

F.   Without prejudice to the rights of any other non-Debtor party-in-interest (but subject to the limitations thereon described below in Paragraph 19) the Debtors hereby agree and stipulate that:

(i) as of the Petition Date, the Debtors were truly and justly indebted to the First Lien Noteholders and First Lien Indenture Trustee in the principal amount of approximately $393.6 million, plus accrued and unpaid interest with respect thereto and any additional reasonable fees, costs and expenses pursuant to the First Lien Notes Documents (the "First Lien Indebtedness");

(ii) the First Lien Notes Liens securing the First Lien Notes Obligations were granted by the applicable Debtors to the First Lien Collateral Agent, for its benefit and the benefit of the First Lien Noteholders, including a first priority security interest in and lien upon, among other things, the Debtors' real property, fixtures, equipment, intellectual property and the other Prepetition Working Capital Second Priority Collateral (the "Prepetition First Lien Notes First Priority Collateral") and a second priority security interest in and lien upon, among other things, the Working Capital First Priority Collateral (the "Prepetition First Lien Notes Second Priority Collateral," and together with the Prepetition First Lien Notes First Priority Collateral, the "Prepetition First Lien

Notes Collateral," and the Prepetition First Lien Notes Collateral together with the Prepetition Working Capital Collateral, the "Prepetition Collateral"); and

(iii)(a) the First Lien Notes Obligations constitute legal, valid and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the First Lien Notes Obligations exist; (c) no portion of the First Lien Notes Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the First Lien Notes Documents are valid and enforceable by the First Lien Indenture Trustee, First Lien Collateral Agent and First Lien Noteholders against each of the Debtors; (e) the First Lien Notes Liens constitute valid, binding, enforceable and perfected liens in and to the Prepetition First Lien Notes Collateral, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the First Lien Notes Obligations constitute allowed secured claims against the Debtors' estates; and (g) no claim of or cause of action held by the Debtors exists against the First Lien Indenture Trustee, First Lien Collateral Agent, First Lien Noteholders or their agents, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the First Lien Documents (or the transactions contemplated thereunder), First Lien Notes Obligations or First Lien Notes Liens, including without limitation, any right to assert any disgorgement or recovery.

G. Without prejudice to the rights of any other non-Debtor party-in-interest (but subject to the limitations thereon described below in Paragraph 19) the Debtors hereby agree and stipulate that:

(i) as of the Petition Date, the Debtors were truly and justly indebted to the Second Lien Noteholders and Second Lien Indenture Trustee in the principal amount of approximately $250 million, plus accrued and unpaid interest with respect thereto and any additional reasonable fees, costs and expenses pursuant to the Second Lien Notes Documents (the "Second Lien Indebtedness");

(ii) the Second Lien Notes Liens securing the Second Lien Notes Obligations were granted by the applicable Debtors to the Second Lien Collateral Agent, for its benefit and the benefit of the Second Lien Noteholders, including a second priority security interest in and lien upon, among other things, the Debtors' Prepetition Collateral; and

(iii)(a) the Second Lien Notes Obligations constitute legal, valid and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Second Lien Notes Obligations exist; (c) no portion of the Second Lien Notes Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Second Lien Notes Documents are valid and enforceable by the Second Lien Indenture Trustee, Second Lien Collateral Agent and Second Lien Noteholders against each of the Debtors; (e) the Second Lien Notes Liens constitute valid, binding, enforceable and perfected liens in and to the Prepetition Collateral, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code

or applicable non-bankruptcy law; and (f) no claim of or cause of action held by the Debtors exists against the Second Lien Indenture Trustee, Second Lien Collateral Agent, Second Lien Noteholders or their agents, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Second Lien Documents (or the transactions contemplated thereunder), Second Lien Notes Obligations or Second Lien Notes Liens, including without limitation, any right to assert any disgorgement or recovery. The foregoing stipulations in this Paragraph G shall have no bearing or impact on the Debtors' ability to present evidence with respect to, or otherwise make assertions or arguments concerning, the value of the Second Lien Notes Collateral (as defined herein).

H. The Debtors hereby agree and stipulate that:

(i) If at any time, any insolvency or foreclosure proceedings or any similar proceeding under any applicable law are instituted, commenced or, to the Borrower's knowledge, threatened in any jurisdiction with respect to any of the Borrower's foreign subsidiaries or any collateral securing the Foreign Debt Obligations (any such event, a "Foreign Debt Foreclosure Event"), in each case, other than pursuant to the Chapter 11 Cases or the proceedings of the Canadian Debtors in the Canadian Court: (i) the Borrower and the affected foreign subsidiary shall immediately seek to cure the Foreign Debt Foreclosure Event, including by using commercially reasonable efforts to have any such proceedings reversed, stayed or vacated in any applicable jurisdiction, (ii) if the Foreign Debt Order has not been entered by this Court at or prior to the time of such

13

Foreign Debt Foreclosure Event, the Borrower shall immediately, and in any event within one (1) business day (or up to three (3) business days in the event that the calendar of this Court does not permit for any shorter period), seek the entry of the Foreign Debt Order by this Court on an emergency basis; (iii) if the Foreign Debt Recognition Order has not been entered by the Canadian Court at or prior to the time of such Foreign Debt Foreclosure Event, the Borrower shall immediately, and in any event within one (1) business day, seek the entry of the Foreign Debt Recognition Order by the Canadian Court on an emergency basis; and (iv) if each of the Foreign Debt Order and the Foreign Debt Recognition Order has been entered at or prior to the time of (or is entered at any time after) such Foreign Debt Foreclosure Event, the Borrower shall immediately request the Foreign Debt Draw in an amount necessary to satisfy the Foreign Debt Obligations in full in cash and, immediately upon receipt of the proceeds of such Foreign Debt Draw, apply such proceeds to so satisfy such Foreign Debt Obligations as, and to the extent, permitted by this Final Order, the Foreign Debt Order, the Foreign Debt Recognition Order and the DIP Agreement; provided, however, that in the event of a Foreign Debt Foreclosure Event, the relevant foreign subsidiaries of the Borrower shall immediately use any funds on hand in excess of amounts actually needed to operate their respective businesses, as in effect at such time, to satisfy the Foreign Debt Obligations prior to the funding of the Foreign Debt Draw by the Lenders.

I.    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, pay their employees,

14

purchase and supply new inventory and otherwise finance their operations is essential to the Debtors' continued viability. In addition, based on the record presented at the Hearings: (i) the Debtors' critical need for financing is immediate; (ii) in the absence of the DIP Facility, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur; and (iii) the preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful reorganization of the Debtors.

J. The Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Facility Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. New credit is unavailable to the Debtors without providing the DIP Agent and DIP Lenders the (i) DIP Facility Superpriority Claims (as defined below) and (ii) DIP Facility Liens (as defined below) in the DIP Facility Collateral (as defined below), as provided herein and in the DIP Facility Documents.

K. Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Lenders and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lenders have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

NY 71992804v10

L. An immediate and critical need exists for the Debtors to use the Cash Collateral (in addition to the DIP Facility) to continue to operate their businesses in the ordinary course, pay wages, maintain business relationship with vendors, suppliers and customers, make capital expenditures, make adequate protection payments, generally conduct their business affairs so as to avoid immediate and irreparable harm to their estates and the value of their assets, and afford the Debtors adequate time to finalize and execute documents under the DIP Facility (subject to and within the limits imposed by the terms of this Final Order).

M. The Debtors have agreed to provide to the Prepetition Working Capital Agent (i) a borrowing base report on a weekly basis delivered on the same schedule as required under the Prepetition Working Capital Credit Agreement and the Prepetition Fixed Asset Credit Agreement, (ii) a variance report with respect to the borrowing base report on a weekly basis, and (iii) the reporting to be provided to the DIP Lenders under the DIP Agreement.

N. The Prepetition Working Capital Agent, on behalf of the Prepetition Working Capital Lenders, and the Ad Hoc Group of First Lien Noteholders have consented to the (i) financing arrangements contemplated by this Final Order and the DIP Facility Documents and (ii) Debtors' proposed use of their Cash Collateral, on the terms and conditions set forth in this Final Order. The consent of the Prepetition Working Capital Agent, on behalf of the Prepetition Working Capital Lenders, and the Ad Hoc Group of First Lien Noteholders is expressly limited to the postpetition financing being provided by the DIP Lenders (as contemplated by this Final Order and the DIP Facility Documents) and the provision of adequate protection herein, and shall not extend to any other postpetition financing or to any modified version of the DIP Facility.

O. The consent of the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders and Ad Hoc Group of First Lien Noteholders to the priming of their liens by the DIP Facility Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders and Ad Hoc Group of First Lien Noteholders that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Final Order or otherwise.

P. Notice of the Final Hearing and the entry of this Final Order has been provided to: (i) counsel to the Committee; (ii) the U.S. Trustee; (iii) the Securities and Exchange Commission; (iv) counsel to the DIP Agent; (v) counsel to the Prepetition Working Capital Agent; (vi) the First Lien Indenture Trustee; (vii) The Bank of New York Mellon, as Indenture Trustee for the 18% Senior Subordinated Notes due 2012; (viii) counsel to the Ad Hoc Group of Second Lien Noteholders; (ix) the Second Lien Indenture Trustee; and (x) any other parties requesting such notice (collectively, the "Notice Parties"). Requisite notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Final Order.

Q. The Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Final Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed. This Court concludes that entry of this Final Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

17

Based on the foregoing, and upon the record made before this Court at the Final Hearing, and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      Approval of Final Order. The Motion is approved on the terms and conditions set forth in this Final Order. Any objections that have not previously been withdrawn are hereby overruled. This Final Order shall become effective immediately upon its entry.

2.      Approval of DIP Facility Documents; Authority Thereunder. The Debtors are hereby authorized to enter into the DIP Facility Documents, including the DIP Agreement, and such additional documents, instruments and agreements as may be required or requested by the DIP Agent or the DIP Lenders to implement the terms or effectuate the purposes of this Final Order. The Borrower and the Guarantors are authorized to comply with and perform all of the terms and conditions contained in the DIP Facility Documents and the Borrower is directed to repay amounts borrowed, and each Guarantor (including Pliant Toronto, but only to the extent described in footnote 3 above) is further directed to repay amounts guaranteed, together with interest and premiums (as applicable) thereon and any other outstanding DIP Obligations to the Lenders in accordance with and subject to the terms and conditions set forth in the DIP Facility Documents and this Final Order.

3.      Authorization to Borrow/Use of Cash Collateral. Provided that the Debtors are not in default under the terms of (i) the Interim Order and, upon entry, this Final Order or (ii) the DIP Facility Documents, the Debtors are authorized to borrow from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $75 million; provided, however, that to the extent the Debtors have not obtained the Foreign Draw Order and the Foreign Draw Recognition Order, each in form and substance satisfactory to the DIP

18

Lenders, on or before the Foreign Draw Trigger Date, the Debtors shall only be authorized to borrow from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $50 million and shall not be permitted to request the Foreign Debt Draw in order to repay the Prepetition Foreign Subsidiary Obligations. The Borrower is authorized to use the proceeds of the loans under the DIP Facility (the "Loans"), and Pliant and the other Debtors are authorized to use Cash Collateral, in the operation of the Debtors' businesses, provided, that any proposed Loan or use of Cash Collateral is consistent with the terms of the DIP Facility Documents and this Final Order.

4.        Cash Collateral Consent Withdrawal Notice. At any time and for any reason, including, but not limited to, the filing of a plan of reorganization by the Debtors or any other party, that provides for the treatment of the Prepetition Working Capital Lenders other than payment in full, in cash, on the effective date of such plan, the Prepetition Working Capital Agent may withdraw its consent to the Debtors' use of Cash Collateral of the Prepetition Working Capital Lenders upon five (5) business days prior written notice to the counsel to the Debtors, Secured Lending Entities (other than the Prepetition Working Capital Agent and the Prepetition Working Capital Lenders) and the Committee (the "Cash Collateral Consent Withdrawal Notice"). Upon receipt of the Cash Collateral Consent Withdrawal Notice, each of the Debtors, DIP Agent, DIP Lenders and the Committee shall be entitled to seek an emergency hearing to be held within five (5) business days from the date of the Cash Collateral Consent Withdrawal Notice for the purpose of obtaining an order authorizing the Debtors' use of Cash Collateral of the Prepetition Working Capital Lenders over their objection (the "Cash Collateral Hearing"). Unless this Court enters an order within five (5) business days from the date of the Cash Collateral Consent Withdrawal Notice authorizing the Debtors' to continue to use the Cash

19

Collateral of the Prepetition Working Capital Lenders, the Debtors' right to use Cash Collateral of the Prepetition Working Capital Lenders shall terminate. During the time period between and including the date of the Cash Collateral Consent Withdrawal Notice and the date that is five (5) business days after the receipt of the Cash Collateral Consent Withdrawal Notice by counsel to the Debtors, Secured Lending Entities (other than the Prepetition Working Capital Agent and Prepetition Working Capital Lenders) and the Committee, the Debtors are authorized to continue to use Cash Collateral of the Prepetition Working Capital Lenders for the payment of the ordinary course operating expenses of the Debtors' businesses.

5.        <u>Payment of Adequate Protection</u>.  Provided that the Debtors are not in default under the terms of (i) the Interim Order and, upon entry, this Final Order or (ii) the DIP Facility Documents, the Debtors are authorized to use the proceeds of the Loans, in part, to make certain adequate protection payments to the Prepetition Working Capital Lenders and the First Lien Noteholders, as provided for in Paragraphs 10 and 11 of this Final Order.

6.        <u>Payment of DIP Fees and Expenses</u>.  The Debtors are hereby authorized and directed to pay upon demand all fees, costs, expenses and other amounts payable under the terms of the DIP Facility Documents and all other reasonable, out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders in accordance with the terms of the DIP Facility Documents (including, without limitation, the reasonable, out-of-pocket prepetition and postpetition fees, costs and expenses of legal counsel, financial advisors and third-party appraisers and consultants advising the DIP Agent and the DIP Lenders). None of such fees, costs, expenses or other amounts shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  Copies of any such invoices (redacted to remove

20

confidential or attorney-client privileged information) shall be provided to the U.S. Trustee, the Committee and counsel for the Ad Hoc Group of Second Lien Noteholders. In addition, the Debtors are hereby authorized and directed to indemnify the DIP Agent and DIP Lenders (and each of their respective directors, officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons) against any liability arising in connection with the DIP Facility Documents, to the extent set forth in the DIP Facility Documents. All such unpaid fees, costs, expenses and other amounts and indemnities of the DIP Agent and DIP Lenders shall be secured by the DIP Facility Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Facility Documents.

7.        Validity of DIP Facility Documents. The DIP Facility Documents shall constitute, and are hereby deemed to be the legal, valid and binding obligations of the Debtors party thereto, enforceable against each such Debtor in accordance with the terms of the DIP Facility Documents. No obligation, payment, transfer or grant of security under the DIP Facility Documents or this Final Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

8.        DIP Facility Superpriority Claims. In accordance with Bankruptcy Code section 364(c)(1), the DIP Obligations shall constitute claims (the "DIP Facility Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided, however, that the

21

DIP Facility Superpriority Claims shall be (a) junior in priority to the Prepetition Working Capital Superpriority Claims, solely with respect to the Prepetition Working Capital Replacement Liens on the Postpetition Working Capital First Priority Collateral and (b) subject to the Carve-Out (as defined below). The DIP Facility Superpriority Claims shall not be payable with the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code (the "Avoidance Actions").

         9.        DIP Facility Liens.  As security for the DIP Obligations, the DIP Agent and the DIP Lenders are hereby granted (effective upon the date of this Final Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lock box or control agreements, financing statements, or any other instrument or otherwise) valid and perfected, security interests in, and liens upon (such security interests and liens collectively, the "DIP Facility Liens"), all present and after-acquired property of the Debtors of any nature whatsoever, including, without limitation: (x) all cash contained in any account maintained by any of the Debtors; (y) a pledge, on a first priority basis, of any such property that is stock (or an equivalent equity interest) of a foreign subsidiary of a Debtor, subject to Paragraph 10(ii) hereof; provided, however, that the pledge of such stock or equivalent equity interest of a foreign subsidiary of a Debtor shall be on a junior basis with respect to any previously encumbered stock or equivalent equity interest of a foreign subsidiary of a Debtor (to the extent so encumbered pursuant to the Prepetition Working Capital Facility Documents); and (z) the proceeds of all causes of action of the Debtors or their estates (other than the Avoidance Actions), whether pursuant to federal law or applicable state law (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral"), consisting of:

22

(a)    pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, a first priority, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date, including, without limitation, the capital stock (or an equivalent equity interest) of the foreign subsidiaries of the Debtors, subject to Paragraph 10(ii) hereof;

(b) pursuant to section 364(c)(3) of the Bankruptcy Code, subject to the Carve-out, a junior, perfected lien on and security interest (other than as set forth in clause (c) below) in all of the Debtors' right, title and interest in, to and under all DIP Collateral which is subject to (i) any validly perfected security interest or lien in existence as of the Petition Date that is not subject to section 552(a) of the Bankruptcy Code, or (ii) any valid security interest or lien perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code) that is not subject to section 552(a) of the Bankruptcy Code; and

(c) pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under the DIP Collateral, subject only to (i) the Carve-Out, (ii) the liens of the Prepetition Working Capital Agent and Prepetition Working Capital Lenders in the Prepetition Working Capital First Priority Collateral and the Postpetition Working Capital First Priority Collateral (as defined below), and the liens of the Prepetition Fixed Asset Agent and the Prepetition Fixed Asset Lenders under the Prepetition Fixed Asset Credit Agreement on assets constituting DIP Collateral; provided, however, that,

23

notwithstanding the foregoing, the liens and security interests granted in favor of the DIP Agent and DIP Lenders pursuant to this clause (c) with respect to the assets of Pliant Toronto shall be senior to the liens of such Prepetition Working Capital Agent, Prepetition Working Capital Lenders, Prepetition Fixed Asset Agent and Prepetition Fixed Asset Lenders on such assets upon the repayment in full in cash of the outstanding obligations of Pliant Toronto as a borrower or guarantor under the Prepetition Working Capital Credit Agreement and the Prepetition Fixed Asset Credit Agreement, and (iii) a valid perfected lien that is a "Customary Permitted Lien" (as defined in the DIP Agreement) and expressly permitted in the DIP Agreement to be senior to the DIP Facility Liens granted to the DIP Agent and the DIP Lenders in this Final Order to secure the DIP Obligations.

10.     Prepetition Working Capital Credit Facility Adequate Protection. As adequate protection of the interests of the Prepetition Working Capital Agent and the Prepetition Working Capital Lenders on account of the Prepetition Working Capital Liens as a result of (a) the provisions of this Final Order granting first priority and/or priming liens on such Prepetition Working Capital Second Priority Collateral to the DIP Agent and DIP Lenders; (b) authorizing the use of Cash Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; or (d) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Prepetition Working Capital Agent and Prepetition Working Capital Lenders are hereby granted, solely to the extent of the diminution in value of the Prepetition Working Capital Liens in the Prepetition Working Capital Collateral from and after the Petition Date:

24

(i) (a) payments of cash interest on a current basis, calculated at the default rate under the Prepetition Working Capital Facility Agreement and subject in all respects to the rights of the Debtors, the Committee and any other party-in-interest to challenge the payment of such interest pursuant to section 506(b) of the Bankruptcy Code; and (b) payments in cash promptly following receipt by the Debtors of any invoice therefor, of all reasonable fees, costs and expenses of one financial advisor (other than a "success" or transaction related fee), one firm of outside counsel, one firm of local counsel in the State of Delaware, one firm of local counsel in Canada and the Prepetition Working Capital Agent, in each case, as provided under the terms of the Prepetition Working Capital Facility Agreement as in effect on the Petition Date; provided, however, that none of such fees, costs and expenses as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Copies of any such invoices (redacted to remove confidential or attorney-client privileged information) shall be provided to the U.S. Trustee, the Committee and counsel for the Ad Hoc Group of Second Lien Noteholders;

(ii) valid, enforceable, unavoidable and fully perfected replacement liens and security interests, which shall not be subject to the Carve-Out, in the postpetition collateral of the same nature and type as the Prepetition Working Capital Collateral, and the capital stock (or an equivalent equity interest) of the foreign subsidiaries of the Debtors, in each case on the same basis and in the same relative priority as the Prepetition Working Capital Liens, which (x) with respect to collateral of the same nature and type as the Prepetition Working Capital First Priority Collateral (the "Postpetition Working

25

Capital First Priority Collateral"), shall be senior to the DIP Facility Liens; and (y) with respect to collateral of the same nature and type as the Prepetition Working Capital Second Priority Collateral, shall be junior to the DIP Facility Liens and First Lien Notes Replacement Liens (as defined below) (collectively, the "Prepetition Working Capital Replacement Liens"); provided, however, that (1) the relative priority of the DIP Liens and the Prepetition Working Capital Replacement Liens with respect to the pledge of any such property that is capital stock (or an equivalent equity interest) of the foreign subsidiaries of the Debtors which is not otherwise encumbered by a lien as of the Petition Date (the "Unencumbered Foreign Stock") shall be as provided in the Prepetition Intercreditor Agreement, if applicable, as determined by this Court after a request made by either party, and the Prepetition Working Capital Agent agrees to, and pursuant to this Final Order shall, hold any and all certificates and stock powers evidencing the Unencumbered Foreign Stock as agent and/or bailee for perfection for the DIP Agent on behalf of the DIP Lenders, and (2) the Prepetition Working Capital Replacement Liens shall not include liens on the proceeds of Avoidance Actions; and

(iii) superpriority administrative expense claims (the "Prepetition Working Capital Superpriority Claims") under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the Prepetition Working Capital Replacement Liens do not adequately protect against the diminution in value of the Prepetition Working Capital Liens, which Prepetition Working Capital Superpriority Claims, if any, shall (with respect to the Prepetition Working Capital Replacement Liens on the Prepetition Working Capital Second Priority Collateral, subject to the DIP Facility Superpriority Claims) have priority in payment over any and all administrative expenses

26

of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including (i) those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code and (ii) solely in the case of the Prepetition Working Capital Replacement Liens on the Postpetition Working Capital First Priority Collateral, the DIP Facility Superpriority Claims; provided, however, that the Prepetition Working Capital Superpriority Claims shall not be payable with the proceeds of Avoidance Actions.

This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Working Capital Agent or the Prepetition Working Capital Lenders to seek additional forms of adequate protection at any time.

11.       First Lien Noteholders' Adequate Protection.  As adequate protection of the interests of the First Lien Indenture Trustee, First Lien Collateral Agent and First Lien Noteholders on account of the First Lien Notes Liens, as a result of the (a) provisions of this Final Order granting first priority and/or priming liens on the Prepetition First Lien Notes Collateral to the DIP Agent and DIP Lenders; (b) authorization of the Debtors' use of Cash Collateral; (c) imposition of the automatic stay pursuant to Bankruptcy Code section 362; or (d) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the First Lien Indenture Trustee, First Lien Collateral Agent and First Lien Noteholders are hereby granted, solely to the extent of the diminution in value of the First Lien Notes Liens in the Prepetition First Lien Notes Collateral from and after the Petition Date:

(i) (a) on the date of entry of the Interim Order, payment-in-kind in an amount equal to the aggregate accreted value of all accrued and unpaid interest as of the

27

Petition Date at the non-default contract rate under the First Lien Indenture; and (b) subsequent to the date of entry of the Interim Order, and through and including the Effective Date, payment-in-kind on a monthly basis of all interest accruing on the First Lien Notes at the non-default contract rate (without prejudice to the First Lien Noteholders' right to later assert claims for interest at the default rate);

(ii) payments in cash promptly following receipt by the Debtors of any invoice therefor, of the (i) reasonable fees, costs and expenses for Stroock & Stroock & Lavan LLP ("Stroock"), Richards, Layton & Finger, P.C. ("RLF") and Goodmans LLP ("Goodmans"), as legal counsel, and Houlihan Lokey Howard & Zukin ("HLHZ"), as financial advisor, to the Ad Hoc Group of First Lien Noteholders, in each case, pursuant to the terms of their respective prepetition engagement letters, and (ii) reasonable fees, costs and expenses (including fees, costs and expenses of legal counsel) of the First Lien Indenture Trustee; provided, however, that none of such fees of Stroock, Goodmans, RLF, HLHZ or the First Lien Indenture Trustee as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Copies of any such invoices (redacted to remove confidential or attorney-client privileged information) shall be provided to the U.S. Trustee, the Committee and counsel for the Ad Hoc Group of Second Lien Noteholders;

(iii) valid, enforceable, unavoidable and fully perfected replacement liens and security interests, subject to the Carve-Out, in the postpetition collateral of the same nature and type as the Prepetition First Lien Notes Collateral, on the same basis and in the same relative priority as the Prepetition First Lien Notes Liens to the Prepetition First

28

Lien Notes Collateral, which (x) with respect to the collateral of the same nature and type as the Prepetition First Lien Notes First Priority Collateral, shall be junior in priority to the DIP Facility Liens, and (y) with respect to the collateral of the same nature and type as the First Lien Notes Second Priority Collateral, shall be junior in priority to the DIP Facility Liens and Prepetition Working Capital Replacement Liens on the Postpetition Working Capital First Priority Collateral (collectively, the "First Lien Notes Replacement Liens"); provided, however, the First Lien Notes Replacement Liens shall not include liens on the proceeds of Avoidance Actions; and

(iv)    superpriority administrative expense claims (the "First Lien Notes Superpriority Claims") under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the First Lien Notes Replacement Liens do not adequately protect against the diminution in value of the First Lien Notes Liens, which First Lien Notes Superpriority Claims, if any, shall, have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise, and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided, however, that (1) the First Lien Notes Superpriority Claims shall be (a) junior in priority to the DIP Facility Superpriority Claims and the Prepetition Working Capital Superpriority Claims (solely with respect to the Prepetition First Lien Notes Second Priority Collateral) and (b) subject to the Carve-Out and (2) the First Lien Superpriority Claims shall not be payable with the proceeds of Avoidance Actions.

NY 71992804v10

This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the First Lien Indenture Trustee or the First Lien Noteholders to seek additional forms of adequate protection at any time (including, without limitation, cash adequate protection payments).

12.    Second Lien Noteholders' Adequate Protection.    As adequate protection of the interests of the Second Lien Notes Parties on account of the Second Lien Notes Liens in the collateral securing the Second Lien Notes Obligations (the "Second Lien Notes Collateral"), the Second Lien Notes Parties are hereby granted, solely to the extent of the diminution in value (if any value or diminution thereof exists) of the Second Lien Notes Liens in the Second Lien Notes Collateral from and after the Petition Date:

(i)    valid, enforceable, unavoidable and fully perfected replacement liens and security interests, subject to the Carve-Out, in the postpetition collateral of the same nature and type as the Second Lien Notes Collateral, on the same basis and in the same relative priority as the Second Lien Notes Liens to the Second Lien Notes Collateral, which shall be junior in priority to the DIP Facility Liens, Prepetition Working Capital Replacement Liens (but solely with respect to the Postpetition Working Capital First Priority Collateral) and First Lien Notes Replacement Liens (but solely with respect to the Prepetition First Lien Notes First Priority Collateral) (collectively, the "Second Lien Notes Replacement Liens"); provided, however, that (1) the granting of the Second Lien Notes Replacement Liens pursuant to this Final Order does not constitute a finding or conclusion of law that the Second Lien Notes Liens have any value beyond the value of the Prepetition Working Capital Liens and the First Lien Notes Liens, but is merely a recognition that if such value does exist, that the Second Lien Notes Parties shall have

30

replacement liens, solely to the extent of the diminution of value of the Second Lien Notes Liens in the Second Lien Notes Collateral from and after the Petition Date and (2) the Second Lien Notes Replacement Liens shall not include liens on the proceeds of Avoidance Actions; and

(ii)    superpriority administrative expense claims (the "Second Lien Notes Superpriority Claims") under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the Second Lien Notes Replacement Liens do not adequately protect against the diminution in value (if any value or diminution thereof exists) of the Second Lien Notes Liens, which Second Lien Notes Superpriority Claims, if any, shall, have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise, and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided, however, that (1) the Second Lien Notes Superpriority Claims shall be (a) junior in priority to the DIP Facility Superpriority Claims, the Prepetition Working Capital Superpriority Claims and the First Lien Notes Superpriority Claims and (b) subject to the Carve-Out and (2) the Second Lien Superpriority Claims shall not be payable with the proceeds of Avoidance Actions; provided further, however, that the granting of the Second Lien Superpriority Claims pursuant to this Final Order does not constitute a finding or conclusion of law that the Second Lien Notes Liens have any value beyond the value of the Prepetition Working Capital Liens and the First Lien Notes Liens, but is merely a recognition that if such value does exist, that the Second Lien

31

Notes Parties shall have Second Lien Superpriority Claims, solely to the extent of the diminution of value of the Second Lien Notes Liens in the Second Lien Notes Collateral from and after the Petition Date.

13.     No Waiver of Prepetition Working Capital Credit Agreement Provisions. Except as otherwise specifically provided in this Final Order, nothing contained in this Final Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Prepetition Working Capital Credit Agreement by the Prepetition Working Capital Agent or the Prepetition Working Capital Lenders, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors.

14.     No Waiver of First Lien Indenture Provisions. Except as otherwise specifically provided in this Final Order, nothing contained in this Final Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the First Lien Indenture by the First Lien Indenture Trustee or the First Lien Noteholders, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors.

15.     No Waiver of Second Lien Indenture Provisions. Except as otherwise specifically provided in this Final Order, nothing contained in this Final Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the ~~First~~ Second Lien Indenture by the Second Lien Indenture Trustee or the Second Lien Noteholders, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors.

32

16.     <u>Prepetition Intercreditor Agreement</u>.    In determining the relative priorities and rights of the Prepetition Secured Entities and the Second Lien Notes Parties (including, without limitation, the relative priorities and rights of the Prepetition Secured Entities and the Second Lien Notes Parties with respect to any replacement liens, administrative claims, or amounts paid by the Debtors hereunder), pursuant to section 510 of the Bankruptcy Code, such priorities and rights shall continue to be governed by that certain Amended and Restated Intercreditor Agreement, dated as of February 17, 2004, by and among the Debtors, Prepetition Working Capital Agent, First Lien Indenture Trustee, the Second Lien Indenture Trustee and the other parties signatory thereto (as in effect on the date hereof, the "<u>Prepetition Intercreditor Agreement</u>"), and nothing in this Final Order or the DIP Facility Documents shall impair, diminish or otherwise affect the Prepetition Intercreditor Agreement.

17.     <u>Prepetition Intercreditor Agreement Not Impediment to Entry of Final Order</u>.    Nothing contained in the Prepetition Intercreditor Agreement shall impede entry of this Final Order or the rights of the Debtors to enter into the DIP Facility on the terms and conditions contained herein and in the DIP Facility Documents; <u>provided, however</u>, that the rights of each party to the Prepetition Intercreditor Agreement are reserved in all respects.

18.     <u>Carve-Out</u>.    Upon the occurrence of an Event of Default (as such term is defined in the DIP Agreement) and continuance thereof (the "<u>Carve-Out Event</u>"), to the extent unencumbered funds are not available to pay administrative expenses in full, the DIP Facility Liens, DIP Facility Superpriority Claims, First Lien Notes Superpriority Claims, First Lien Notes Replacement Liens, Second Lien Notes Replacement Liens, First Lien Notes Liens and Second Lien Notes Liens shall be subject to the payment of (x) any unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event by the professionals retained by the

33

Debtors or the professionals retained by Committee in these Chapter 11 Cases (collectively, the "Professionals") to the extent allowed by an order of this Court, plus (y) those fees, costs and expenses incurred by Professionals after the Carve-Out Event and subsequently allowed by order of this Court, provided that the amounts under (x) and (y) shall not in the aggregate exceed $3,000,000, plus (z) fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Court and any statutory or other Canadian Court ordered fees that are not secured by a charge granted by the Canadian Court (collectively, the "Carve-Out"); provided, however, that no portion of the Carve-Out, DIP Facility, DIP Facility Collateral, Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or the Committee, in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the Secured Lending Entities, including, without limitation, (a) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Facility Superpriority Claims or security interests and liens of the DIP Agent or DIP Lenders in respect thereof, (b) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Working Capital Facility Obligations, Prepetition Working Capital Superpriority Claims or security interests and liens of the Prepetition Working Capital Agent or Prepetition Working Capital Lenders in respect thereof, (c) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the First Lien Notes Obligations, First Lien Notes Superpriority Claims or security interests and liens of the First Lien Collateral Agent, First Lien Indenture Trustee or the First Lien Noteholders in respect thereof, or (d) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting

any defense, counterclaim, or offset to the Second Lien Notes Obligations, Second Lien Notes Superpriority Claims or security interests and liens of the Second Lien Collateral Agent, Second Lien Indenture Trustee or the Second Lien Noteholders in respect thereof, or (ii) asserting any claims or causes of action, including, without limitation, claims or actions to hinder or delay the DIP Agent's or DIP Lenders' assertion, enforcement or realization on the DIP Facility Collateral in accordance with the DIP Facility Documents or this Final Order; provided, further, however, that no more than $100,000 of the proceeds of the DIP Facility or any proceeds of the DIP Facility Collateral may be used to fund an investigation by the Committee into the existence of any causes of action or other type of litigation against the Prepetition Secured Entities with respect to the Prepetition Working Capital Obligations, the First Lien Notes Obligations, or the Second Lien Notes Obligations. Notwithstanding the foregoing, so long as a Carve-Out Event has not occurred: (i) the Debtors shall be permitted to pay administrative expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable; and (ii) such payments shall not be applied to reduce the Carve-Out. Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, DIP Agent, DIP Lenders, Committee, U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.

19.       Investigation Rights.  Notwithstanding anything to the contrary in this Final Order: (i) no Cash Collateral may be used directly or indirectly by any of the Debtors, the Committee, or any other person or entity to object to or contest in any manner the Prepetition Working Capital Obligations, the Prepetition Working Capital Facility Documents, First Lien Notes Obligations, First Lien Notes Documents, Second Lien Notes Obligations, or Second Lien

NY 71992804v10

Notes Documents or to assert or prosecute any actions, claims or causes of action (including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code) against any of the Prepetition Working Capital Lenders, the Prepetition Working Capital Agent, First Lien Indenture Trustee, First Lien Collateral Agent, First Lien Noteholders, Second Lien Collateral Agent or Second Lien Noteholders without the consent of such parties; or (ii) without the consent of the Prepetition Working Capital Lenders, Prepetition Working Capital Agent, First Lien Indenture Trustee, First Lien Collateral Agent, First Lien Noteholders, Second Lien Indenture Trustee, Second Lien Collateral Agent or Second Lien Noteholders no party (including the Debtors) shall use Cash Collateral to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the Prepetition Working Capital Replacement Liens, Prepetition Working Capital Superpriority Claims, First Lien Noteholder Replacement Liens, First Lien Noteholder Superpriority Claims, Second Lien Noteholder Replacement Liens or Second Lien Noteholder Superpriority Claims; provided, however, that the Committee shall have a maximum of seventy-five (75) days from the entry of this Final Order (the "Investigation Termination Date") to investigate the validity, perfection and enforceability of the Prepetition Working Capital Liens, Prepetition Working Capital Obligations, First Lien Notes Liens, First Lien Notes Obligations, Second Lien Notes Liens, or Second Lien Notes Obligations or to assert any other claims or causes of action against the Prepetition Secured Entities. The Investigation Termination Date may be extended: (a)(i) solely with respect to investigations of the validity, perfection and enforceability of the Prepetition Working Capital Liens and Prepetition Working Capital Obligations, with the consent of the Committee and the Prepetition Working Capital Agent, (ii) solely with respect to investigations of the validity, perfection and enforceability of the First Lien Notes Liens and First Lien Notes Obligations, with the consent of the Committee

36

and the Ad Hoc Group of First Lien Noteholders, in each case, as memorialized in an order of this Court and (iii) solely with respect to investigations of the validity, perfection and enforceability of the Second Lien Notes Liens and Second Lien Notes Obligations, with the consent of the Committee and the Ad Hoc Group of Second Lien Noteholders, in each case, as memorialized in an order of this Court or (b) pursuant to an order of this Court finding cause for such extension, which order shall have been entered after a hearing initiated by the Committee on ten (10) business days prior notice. If the Committee determines that there may be a challenge to the validity, perfection and enforceability of the Prepetition Working Capital Liens, Prepetition Working Capital Obligations, First Lien Notes Liens, First Lien Notes Obligations, Second Lien Notes Liens, and Second Lien Notes Obligations by the Investigation Termination Date, then upon three (3) days' written notice to the Debtors and the Prepetition Secured Entities, the Committee shall be permitted to file and prosecute a complaint or objection related thereto (each, a "Challenge"), and shall have only until the Investigation Termination Date to file such complaint or objection or otherwise initiate an appropriate action on behalf of the Debtors' estates setting forth the basis of any such challenge, claim or cause of action. The Committee is hereby granted standing to bring a Challenge with respect to the Prepetition Working Capital Liens, Prepetition Working Capital Obligations, First Lien Notes Liens, First Lien Notes Obligations, Second Lien Notes Liens and Second Lien Notes Obligations provided that such Challenge is brought on or before the expiration of the Investigation Termination Date. If a Challenge is not filed on or before the Investigation Termination Date: (a) the agreements, acknowledgements and stipulations contained in Paragraphs E, F and G of this Final Order, shall be irrevocably binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, without further action by any party or this

Court, and the Committee and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge; (b) the liens and security interests of (i) the Prepetition Working Capital Agent and Prepetition Working Capital Lenders, (ii) the First Lien Indenture Trustee, First Lien Collateral Agent and First Lien Noteholders, and (iii) the Second Lien Indenture Trustee, Second Lien Collateral Agent and Second Lien Noteholders shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition Working Capital Indebtedness, First Lien Notes Indebtedness and Second Lien Notes Indebtedness shall be deemed to be finally allowed claims for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, in the amounts set forth in Paragraphs E, F and G respectively, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Entities (whether in their prepetition or postpetition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, controlling persons, assigns and successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, to the Prepetition Working Capital Obligations, the First Lien Notes Obligations or the Second Lien Notes Obligations. The Prepetition Working Capital Agent, First Lien Indenture Trustee, First Lien Notes Collateral Agent, Second Lien Indenture Trustee and Second Lien Notes Collateral Agent shall cooperate in all reasonable requests for information in order to assist the Committee in its investigation under this Paragraph 19. Notwithstanding anything to the contrary herein: (a) if any such Challenge is timely commenced, the stipulations contained in Paragraphs E, F and G of this Final Order shall nonetheless remain binding on all

38

parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (b) the Prepetition Secured Entities reserve all of their rights to contest on any grounds any Challenge.

20.     Protection of DIP Lenders' Rights.  So long as there are any Loans or other amounts outstanding, the DIP Lenders have any Commitment (as defined in the DIP Agreement) under the DIP Agreement or any other DIP Obligations are outstanding, the Prepetition Secured Entities and Second Lien Notes Parties shall (i) not take any action to foreclose upon or recover in connection with their respective liens and security interests, other agreements, or operation of law of this Final Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, (ii) be deemed to have consented to any release of DIP Collateral authorized under the DIP Facility Documents, (iii) except as otherwise provided in this Final Order, not file any further financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, enter into any control agreement, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent files financing statements or other documents to perfect the liens granted pursuant to this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (iv) not seek to terminate or modify the use of Cash Collateral, other than as otherwise provided in this Final Order.

21.     506(c) Waiver.  Upon the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Secured Lending

Entities upon the DIP Facility Collateral or the Prepetition Collateral (as applicable). In no event shall the Secured Lending Entities be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Facility Collateral or the Prepetition Collateral (as applicable).

22.     <u>Restrictions on Granting Postpetition Liens</u>. Other than the Carve-Out, or as otherwise provided in this Final Order, no claim having a priority superior or *pari passu* with those granted by this Final Order to the Secured Lending Entities shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, while (i) any portion of the DIP Facility (or refinancing thereof), any Loans or any other DIP Facility Obligations are outstanding or (ii) the DIP Facility Lenders have any Commitment (as defined in the DIP Facility Agreement) under the DIP Facility Agreement. Except as expressly permitted by the DIP Facility Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Facility Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

23.     <u>Return of Inventory</u>. The Debtors shall not, without the consent of the DIP Agent, DIP Lenders, Prepetition Working Capital Agent and Prepetition Working Capital Lenders: (i) enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under section 546(h) of the Bankruptcy Code; or (ii) consent to any creditor taking any set-off against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

24.     <u>Automatic Effectiveness of Liens</u>. The DIP Facility Liens, Prepetition Working Capital Replacement Liens, First Lien Notes Replacement Liens and Second Lien Notes Replacement Liens shall not be subject to challenge and shall attach and become valid,

perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the Secured Lending Entities and Second Lien Notes Parties and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including without limitation the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions. All DIP Facility Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Facility Documents and this Final Order. If the DIP Agent hereafter requests that the Debtors execute and deliver to the DIP Agent financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Facility Liens, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of the Petition Date.

25.    Automatic Stay. As provided herein, subject only to the provisions of the DIP Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Facility Documents, and to take any or all of the following actions without further order of or application to this Court:

NY 71992804v10

(a) immediately terminate the Debtors' use of Cash Collateral; (b) cease making any DIP Facility Loans to the Debtors; (c) terminate the commitments to make Loans and declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts; (e) immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders against the DIP Obligations, or otherwise enforce rights against the DIP Facility Collateral in the possession of any of the DIP Lenders for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under this Final Order, the DIP Facility Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right in clauses (a), (d) or (e) of this paragraph, the DIP Agent shall be required to provide five (5) business days written notice to the Debtors, their bankruptcy counsel, counsel to the Committee, counsel to the respective Secured Lending Entities and the U.S. Trustee as provided for in Section 9.2 of the DIP Agreement; and during the (5) business day period commencing upon receipt by the Debtors of such notice, the Debtors and the Committee shall be entitled to seek an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default has occurred; provided further, however, that notwithstanding anything in this Final Order to the contrary, following the exercise by the DIP Agent or the DIP Lenders of any of their respective rights or remedies as set forth in this Paragraph 25 or under the DIP Facility Documents or applicable law in respect of the DIP Collateral, no proceeds of the Working Capital First Priority Collateral, including, without limitation, any such collateral, or proceeds thereof, that is subject to the Working Capital Replacement Liens, shall be used to pay any DIP Obligations until after the Prepetition Working Capital Obligations has been paid in full. Upon entry of this Final Order, no party-in-interest shall have the right to contest the enforcement of

42

the rights and remedies set forth in this Final Order and the DIP Facility Documents on any basis other than an assertion that no Event of Default has occurred, and, except with respect to such an assertion, no party-in-interest shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or otherwise, or to seek any injunctive relief inconsistent with the provisions of this Final Order or the DIP Facility Documents. The rights and remedies of the DIP Agent and DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and DIP Lenders may have under the DIP Facility Documents or otherwise. The Debtors shall cooperate fully with the DIP Agent and DIP Lenders in their exercise of their rights and remedies, whether against the DIP Facility Collateral or otherwise. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

26.    Binding Effect. The provisions of this Final Order shall be binding upon and inure to the benefit of the Secured Lending Entities, the Debtors and their respective successors and assigns. To the extent permitted by applicable law, this Final Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Final Order.

27.    Survival. The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases (and, to the extent not satisfied in full in cash, the DIP Obligations shall not be discharged by the entry of any such order, pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge);

43

(ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Final Order as well as the DIP Facility Superpriority Claims and the DIP Facility Liens in the DIP Facility Collateral granted pursuant to this Final Order and the DIP Facility Documents (and with respect to the entry of any order as set forth in (ii) or (iii) herein, the Prepetition Working Capital Replacement Liens, First Lien Notes Replacement Liens, Second Lien Notes Replacement Liens, Prepetition Working Capital Superpriority Claims and First Lien Notes Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Final Order and the DIP Facility Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full and discharged. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Facility Documents.

28.    Modifications of DIP Facility Documents. The Debtors, DIP Agent and DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Facility Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders) of the DIP Facility Documents without further Order of this Court, or any other modifications to the DIP Facility Documents; provided, however, that notice of any material modification or amendment to the DIP Facility Documents shall be provided to counsel to the Committee, to the U.S. Trustee, First Lien Indenture Trustee, Prepetition Working Capital Agent, counsel for the Ad Hoc Group of First Lien Noteholders, Second Lien Indenture Trustee, and counsel for the Ad Hoc Group of Second Lien Noteholders each of whom shall have five (5) days from the date of such notice within which to object in writing to such modification or amendment. If the Committee or the U.S. Trustee timely objects

to any material modification or amendment to the DIP Facility Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

29.     _Insurance Policies_.  Upon entry of this Final Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Facility Collateral: (i) the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds; and (ii) the DIP Agent, on behalf of the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as loss payee; provided, that, in the event of any casualty, condemnation, or similar event (a "Property Loss Event") with respect to property that constitutes DIP Collateral (other than Prepetition Working Capital First Priority Collateral), pursuant to and on the terms set forth in Section 2.9(a) of the DIP Agreement, the Debtors are authorized to apply the proceeds of any such insurance policy relating to such DIP Collateral arising from such Property Loss Event to repair or replace the property that is the subject of such Property Loss Event; provided, however, that, in the event of any Property Loss Event with respect to property that constitutes Prepetition Working Capital First Priority Collateral, pursuant to and on the terms set forth in the Prepetition Working Capital Credit Agreement as in effect on the date hereof, the Debtors are authorized to apply the proceeds of any such insurance policy relating to such Prepetition Working Capital First Priority Collateral arising from such Property Loss Event to repair or replace the property that is the subject of such Property Loss Event.  Notwithstanding the foregoing sentence, the Debtors are authorized and directed to take any actions necessary to have the DIP Agent, on behalf of the DIP Lenders, be added as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Facility Collateral.

NY 71992804v10

30.    <u>Protection Under Section 364(e)</u>.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Entities or the Second Lien Notes Parties incurred prior to the actual receipt by the DIP Agent, Prepetition Working Capital Agent, First Lien Indenture Trustee or Second Lien Indenture Trustee, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Facility Documents with respect to any DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Entities or Second Lien Notes Parties.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Entities or the Second Lien Notes Parties by the Debtors prior to the actual receipt by the DIP Agent, Prepetition Working Capital Agent, First Lien Indenture Trustee or Second Lien Indenture Trustee, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Final Order, and the Secured Lending Entities and the Second Lien Notes Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Final Order, and the DIP Facility Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations, and adequate protection obligations owing to the Prepetition Secured Entities and the Second Lien Notes Parties.

31.    <u>Effect of Dismissal of Chapter 11 Cases</u>.  If the Chapter 11 Cases are dismissed, converted or substantively consolidated, then neither the entry of this Final Order nor

the dismissal, conversion or substantive consolidation of these Chapter 11 Cases shall affect the rights of the Secured Lending Entities and the Second Lien Notes Parties under their respective DIP Facility Documents, Prepetition Working Capital Documents, First Lien Notes Documents, Second Lien Notes Documents or this Final Order, and all of the respective rights and remedies thereunder of the Secured Lending Entities and the Second Lien Notes Parties shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Facility Liens and DIP Facility Superpriority Claims granted to and conferred upon the DIP Agent and DIP Lenders and the protections afforded to the DIP Agent and/or the DIP Lenders pursuant to this Final Order and the DIP Facility Documents shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Facility Liens, DIP Facility Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) those primed or unprimed (as the case may be) Prepetition Working Capital Liens, Prepetition Working Capital Replacement Liens and Prepetition Working Capital Superpriority Claims granted to and conferred upon the Prepetition Working Capital Agent and Prepetition Working Capital Lenders shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Prepetition Working Capital Indebtedness shall have been paid and satisfied in full (and that such Prepetition Working Capital Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties); (iii) those primed First Lien Notes Liens, First Lien Notes Replacement Liens and First Lien Notes Superpriority Claims granted to and conferred upon the First Lien

47

Indenture Trustee, First Lien Collateral Agent and First Lien Noteholders shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all obligations under the First Lien Indenture shall have been paid and satisfied in full (and that such First Lien Notes Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties); (iv) those primed Second Lien Notes Liens and Second Lien Notes Replacement Liens granted to and conferred upon the Second Lien Notes Parties shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all obligations under the Second Lien Indenture shall have been paid and satisfied in full; (v) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Facility Liens, Prepetition Working Capital Replacement Liens, First Lien Notes Replacement Liens, Second Lien Notes Replacement Liens, DIP Facility Superpriority Claims, Prepetition Working Capital Superpriority Claims and First Lien Notes Superpriority Claims referred to herein; and (v) the effectiveness of any order dismissing the Chapter 11 Cases shall not occur until sixty (60) days after it is entered in order to give the Secured Lending Entities and the Second Lien Notes Parties the opportunity to perfect their respective security interests and liens in the collateral under non-bankruptcy law, including, without limitation, the filing or recording of financing statements, mortgages, deeds of trust, security deeds, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar United States entity) and the procurement of waivers from any landlord, tenant, mortgagee, bailee or warehouseman and consents from any licensor or similar party-in-interest.

48

32.    <u>Master Proof of Claim of Prepetition Working Capital Agent</u>.    The Prepetition Working Capital Agent shall be authorized (but not required) to file a master proof of claim against the Debtors (the "<u>Prepetition Working Capital Agent Master Proof of Claim</u>") on behalf of itself and the Prepetition Working Capital Lenders on account of their prepetition claims arising under the Prepetition Working Capital Documents.    If the Prepetition Working Capital Agent so files a Prepetition Working Capital Agent Master Proof of Claim against the Debtors, the Prepetition Working Capital Agent and each Prepetition Working Capital Lender, and each of their respective successors and assigns, shall be deemed to have filed proofs of claim in respect of their claims against the Debtors arising under the Prepetition Working Capital Documents, and the claims of the Prepetition Working Capital Agent and each Prepetition Working Capital Lender (and their respective successors and assigns) shall be allowed or disallowed as if such entities had filed separate proofs of claim in the Chapter 11 Cases or any successor cases. The Prepetition Working Capital Agent shall further be authorized to amend its respective Prepetition Working Capital Agent Master Proof of Claim from time to time.    The provisions set forth in this Paragraph 32 and any Prepetition Working Capital Agent Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the rights of the Prepetition Working Capital Agent and each Prepetition Working Capital Lender as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

33.    <u>Master Proof of Claim of First Lien Indenture Trustee</u>.    The First Lien Indenture Trustee shall be authorized (but not required) to file a master proof of claim against the

49

Debtors (the "First Lien Indenture Trustee Master Proof of Claim") on behalf of itself and the First Lien Noteholders on account of their prepetition claims arising under the First Lien Documents. If the First Lien Indenture Trustee so files a First Lien Indenture Trustee Master Proof of Claim against the Debtors, the First Lien Indenture Trustee and each First Lien Noteholder, and each of their respective successors and assigns, shall be deemed to have filed proofs of claim in respect of their claims against the Debtors arising under the First Lien Documents, and the claims of the First Lien Indenture Trustee and each First Lien Noteholder (and their respective successors and assigns) shall be allowed or disallowed as if such entities had filed separate proofs of claim in the Chapter 11 Cases or any successor cases. The First Lien Indenture Trustee shall further be authorized to amend its respective First Lien Indenture Trustee Master Proof of Claim from time to time. The provisions set forth in this Paragraph 33 and any First Lien Indenture Trustee Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the rights of the First Lien Indenture Trustee and each First Lien Noteholder as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

34.    Master Proof of Claim of Second Lien Indenture Trustee. The Second Lien Indenture Trustee shall be authorized (but not required) to file a master proof of claim against the Debtors (the "Second Lien Indenture Trustee Master Proof of Claim") on behalf of itself and the Second Lien Noteholders on account of their prepetition claims arising under the Second Lien Documents. If the Second Lien Indenture Trustee so files a Second Lien Indenture Trustee Master Proof of Claim against the Debtors, the Second Lien Indenture Trustee and each

NY 71992804v10

Second Lien Noteholder, and each of their respective successors and assigns, shall be deemed to have filed proofs of claim in respect of their claims against the Debtors arising under the Second Lien Documents, and the claims of the Second Lien Indenture Trustee and each Second Lien Noteholder (and their respective successors and assigns) shall be allowed or disallowed as if such entities had filed separate proofs of claim in the Chapter 11 Cases or any successor cases. The Second Lien Indenture Trustee shall further be authorized to amend its respective Second Lien Indenture Trustee Master Proof of Claim from time to time. The provisions set forth in this Paragraph 34 and any Second Lien Indenture Trustee Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the rights of the Second Lien Indenture Trustee and each Second Lien Noteholder as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

35.     <u>Master Proof of Claim of Senior Subordinated Indenture Trustee</u>. The Bank of New York Trust Company, N.A., as indenture trustee (the "<u>Senior Subordinated Indenture Trustee</u>") under that certain Indenture dated as of June 14, 2007 (as in effect on the date hereof, the "<u>Senior Subordinated Indenture</u>) relating to Pliant's 18% Senior Subordinated Notes due 2012 (the "<u>Senior Subordinated Notes</u>") shall be authorized (but not required) to file a master proof of claim against the Debtors (the "<u>Senior Subordinated Indenture Trustee Master Proof of Claim</u>") on behalf of itself and holders of the Senior Subordinated Notes (the "<u>Senior Subordinated Noteholders</u>") on account of their prepetition claims arising under the Senior Subordinated Indenture. If the Senior Subordinated Indenture Trustee so files a Senior Subordinated Indenture Trustee Master Proof of Claim against the Debtors, the Senior

51

Subordinated Indenture Trustee and each Senior Subordinated Noteholder, and each of their respective successors and assigns, shall be deemed to have filed proofs of claim in respect of their claims against the Debtors arising under the Senior Subordinated Indenture, and the claims of the Senior Subordinated Indenture Trustee and each Senior Subordinated Noteholder (and their respective successors and assigns) shall be allowed or disallowed as if such entities had filed separate proofs of claim in the Chapter 11 Cases or any successor cases. The Senior Subordinated Indenture Trustee shall further be authorized to amend its respective Senior Subordinated Indenture Trustee Master Proof of Claim from time to time. The provisions set forth in this Paragraph 35 and any Senior Subordinated Indenture Trustee Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the rights of the Senior Subordinated Indenture Trustee and each Senior Subordinated Noteholder as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

36.     Equal Access to Information.    Any information (including, but not limited to, reports, budgets, borrowing base certificates and financial information) that the Debtors are required to provide to the DIP Agent, DIP Lenders or the Secured Lending Entities under this Final Order or the DIP Facility Documents shall be simultaneously transmitted to the Prepetition Working Capital Agent, counsel for the Committee[and] ~~counsel for the Second Lien Indenture Trustee~~ and counsel for the Ad Hoc Group of Second Lien Noteholders; provided, however, that counsel for the Ad Hoc Group of Second Lien Noteholders ~~and counsel for the Second Lien Indenture Trustee~~ shall not be permitted to share such information with any Second Lien Noteholder absent an appropriate confidentiality agreement or protective order ~~the Second Lien Indenture Trustee or~~ agreed to by and

*[handwritten: — Second Lien Indenture Trustee or]*

among the Debtors, the DIP Lenders and the Second Lien Noteholder to whom counsel to the Ad

Hoc Committee of Second Lien Noteholders seeks to share such information.

*[handwritten: — or counsel for the Second Lien Indenture Trustee]*

37.    Findings of Fact and Conclusions of Law.    This Final Order *[handwritten: (as]*

constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be *[handwritten: applicable)]*

fully enforceable immediately upon the execution thereof.

38.    Choice of Law; Jurisdiction.    The DIP Facility and the DIP Documents

(and the rights and obligations of the parties thereto) shall be governed by, and construed and

interpreted in accordance with, the laws of the State of New York, including, without limitation,

Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent

applicable, the Bankruptcy Code.    The Bankruptcy Court shall have exclusive jurisdiction with

respect to any and all disputes or matters under, or arising out of or in connection with, either the

DIP Facility or the DIP Documents.

39.    Controlling Effect of Final Order.    To the extent any provision of this

Final Order conflicts with any provision of the Motion, the Interim Order, any prepetition

agreement or any DIP Facility Document, the provisions of this Final Order shall control.

Dated: March 20, 2009.

MARY F. WALRATH
CHIEF UNITED STATES BANKRUPTCY JUDGE